UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

**UNITED STATES OF AMERICA,**

   *Plaintiff*,

v.                                                                                               Case No.  SA-23-CR-00595-JKP

**(1) HECTOR CRISTOBAL MEJIA-ESTRADA,**

   *Defendant*.

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant Hector Cristobal Mejia-Estrada's Motion to Suppress Evidence. *See* ECF No. 27. The United States Government filed a response and Mejia-Estrada replied to the response. *See* ECF Nos. 30, 32. The Court gave the parties an opportunity to file supplemental briefings, which both parties did. *See* ECF Nos. 38, 44. The Court then held a hearing on the motion on July 9, 2024. *See* ECF No. 50. After due consideration of the parties' briefings, the video evidence, the hearing testimony, and the admitted hearing exhibits, the Court finds the Government has met its burden to show the traffic stop was constitutional and, therefore, **DENIES** the motion to suppress. *See* ECF No. 27.

**BACKGROUND**

On October 25, 2023, Gonzales County Sheriff's Deputy Haeden Perrenot was patrolling Interstate I-10 when Defendant Hector Cristobal Mejia-Estrada passed him driving a red Camaro that appeared to have no front license plate, which is a violation of Texas law. Deputy Perrenot pulled behind the Camaro, ran its license plate, and was unable to confirm whether it was

insured, which is also a violation of Texas law. Based on this information, Deputy Perrenot pulled Mejia-Estrada over. The traffic stop was recorded on a contemporaneous dash camera video. Deputy Perrenot explained to the passengers he pulled them over for having no front license plate and because he was unable to confirm whether the car was insured. He then asked for a driver's license and proof of insurance.

Mejia-Estrada and his female passenger, both Spanish-speakers, had difficulty communicating with Deputy Perrenot in English. Mejia-Estrada handed Deputy Perrenot a Honduran passport and the passenger provided Mexican identification. Neither one offered a valid driver's license. Mejia-Estrada also provided Deputy Perrenot with an insurance document but it was out-of-date. Deputy Perrenot later testified that when he learned the car's occupants were from different countries, he suspected human trafficking and began asking questions about the nature and purpose of their trip. Mejia-Estrada told Deputy Perrenot they had traveled from Houston to San Antonio earlier that day and were now returning back to Houston because the people who they intended to meet in San Antonio were unavailable. Deputy Perrenot testified in the hearing that he found this explanation to be suspicious. Also in the hearing, Mejia-Estrada testified he was unable to properly explain his plans to Deputy Perrenot because of the language barrier. Mejia-Estrada testified that he and his passenger had gone to San Antonio to find work on an oil rig but were unable to do so because the job site they planned to visit was closed due to weather conditions.

After obtaining the documents, Deputy Perrenot returned to his police vehicle to check Mejia-Estrada's identification and learned Mejia-Estrada or someone by the same name was previously convicted of manslaughter and deported from the United States. Deputy Perrenot returned to the Camaro and asked Mejia-Estrada to step outside, asking if he had any convictions

or had ever been deported from the United States. Mejia-Estrada confirmed both facts. Deputy Perrenot then emptied Mejia-Estrada's pockets, placed Mejia-Estrada in handcuffs in the back of the police vehicle, and began questioning the Camaro's passenger. Though Deputy Perrenot initially told Mejia-Estrada he was not under arrest, Deputy Perrenot did arrest Mejia-Estrada for driving without a driver's license, a violation of Texas Transportation Code § 521.025. On October 26, 2023, immigration officials found Mejia-Estrada in custody at the Gonzales County Jail and conducted their own immigration checks which confirmed Mejia-Estrada had been previously deported and was not lawfully present in the United States, resulting in the charge against Mejia-Estrada in this case for illegal reentry pursuant to 8 U.S.C. § 1326(a) & (b)(1).

Mejia-Estrada brings this Motion to Suppress arguing (1) Deputy Perrenot violated Mejia-Estrada's Fourth Amendment rights by initiating a traffic stop that was unsupported by reasonable suspicion and improperly expanding the traffic stop's scope and (2) the Court should therefore suppress the identity-related fruits of the seizure. *See* ECF No. 27, 38. Mejia-Estrada concedes his argument is foreclosed by Fifth Circuit precedent holding the identity-related fruits of an illegal seizure are not suppressible under the Fourth Amendment in a prosecution for illegal reentry. *See, e.g., United States v. Hernandez-Mandujano*, 721 F.3d 345, 351 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 2134 (2014). He explains he brings this motion simply to preserve the question for appellate review. In his supplemental briefing, Mejia-Estrada makes a new argument that he and his passenger were targeted because of their ethnicity, in violation of the Equal Protection Clause. *See* ECF No. 38. The Government takes issue with Mejia-Estrada's characterization of the traffic stop as unconstitutional, arguing it was supported by reasonable suspicion, appropriate in scope, and not motivated by discrimination. *See* ECF No. 30, 44. For

the reasons discussed herein, the Court finds the Government has met its burden to show the traffic stop was constitutional and denies the motion.

## LEGAL STANDARD

The Fourth Amendment guarantees individuals the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *United State v. Macias*, 658 F.3d 509, 517 (5th Cir. 2011) (*quoting* U.S. Const. amend. IV). Stopping a vehicle, even for a brief time, constitutes a seizure under the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809–10 (1996) (collecting cases); *Macias*, 658 F.3d at 517. "An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Id*. The Government bears the burden of proving, by a preponderance of the evidence, the search or seizure was constitutional. *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001).

The United States Supreme Court has held that, for a traffic stop to be lawful, officers must have "reasonable suspicion that criminal activity may be afoot." *United States v. Basey*, 816 F.2d 980, 988 (5th Cir. 1987) (*citing Terry v. Ohio*, 392 U.S. 1 (1968)). The reasonable suspicion standard is "less demanding" than probable cause and "requires a showing considerably less than preponderance of the evidence," but one must show "at least a minimal level of objective justification for making the stop." *United States v. Ramirez*, No. EP-18-CR-01661-DCG, 2019 WL 96589, at *3 (W.D. Tex. Jan. 3, 2019) (*citing United States v. Jordan*, 232 F.3d 447, 448 (5th Cir. 2000)). Courts have recognized a traffic violation is an objectively reasonable basis on which to conduct a traffic stop. *United States v. Trevino*, No. SA-21-CR-115-JKP, 2022 WL 2441853, at *2 (W.D. Tex. July 5, 2022) (*citing United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005). During such traffic stops, officers are permitted to

detain individuals temporarily for instance, to "verify a violation of the traffic law has occurred or is occurring; and … to issue the appropriate ticket or citation charging the traffic violation or make an arrest of the driver based upon the violation." *United States v. Magana*, 544 F. Supp. 2d 560, 565 (W.D. Tex. 2008).

Generally, the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop…" *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (*citing United States v. Brigham*, 382 F.3d 500, 507 (5th Cir.2004) (en banc)). A recognized exception to this rule applies when officers obtain additional reasonable suspicion during the stop, but before the initial purpose of the stop has been fulfilled, in which case officers may continue the detention until the new reasonable suspicion has been dispelled or confirmed. *United States v. Lopez-Moreno*, 420 F.3d 420, 431 (5th Cir. 2005). To determine the legality of a traffic stop, Courts apply the *Terry* framework, "asking first whether 'the officer's action was justified at its inception' that is, whether the initial stop was valid—and then whether the officer's subsequent actions 'were reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion developed during the stop.'" *United States v. Villafranco-Elizondo*, 897 F.3d 635, 640 (5th Cir. 2018) (quoting *Brigham*, 382 F.3d 500, 506–507).

## DISCUSSION

In this case, Mejia-Estrada argues Deputy Perrenot violated his Fourth Amendment rights by initiating a traffic stop that was unsupported by reasonable suspicion and improperly expanding the traffic stop's scope. Mejia-Estrada further suggests the stop violated the Equal Protection Clause because it was motivated by discrimination. The Government counters Deputy Perrenot's actions were not discriminatory, and the initial stop was objectively reasonable

because the Camaro had no visible front license plate and no car insurance on file. The Government further argues Deputy Perrenot's subsequent actions were reasonably related to the circumstances that justified the stop and his reasonable suspicion that developed during the stop. *Villafranco-Elizondo*, 897 F.3d at 640. Namely, upon questioning the car's passengers, Deputy Perrenot was presented with two foreign identification documents from different countries, no driver's license, no car insurance, and an unusual travel itinerary. These factors led Deputy Perrenot to ask additional questions and check Mejia-Estrada's identification. The Court will first conduct the *Terry* analysis to determine whether the stop violated the Fourth Amendment and then will turn its attention to the Equal Protection argument.

## I.    *Terry* Analysis

Courts apply *Terry* by "asking first whether 'the officer's action was justified at its inception' that is, whether the initial stop was valid—and then whether the officer's subsequent actions 'were reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion developed during the stop.'" *Villafranco-Elizondo*, 897 F.3d at 640.

Here, the record evidence supports Deputy Perrenot's reasonable suspicion that Mejia-Estrada had committed a traffic violation justifying the initial stop. The video evidence clearly depicts no front license plate on the Camaro's front bumper. *See* Dash Camera Video at 0:18. In his hearing testimony, Mejia-Estrada explained the front license plate was propped up on the dashboard behind the windshield; however, that display does not meet Texas requirements. *See* Tex. Admin. Code § 217.27 (registered vehicles "must display two license plates that are clearly visible, readable, and legible, one at the exterior front and one at the exterior rear of the vehicle that are securely fastened at the exterior front and rear of the vehicle in an upright horizontal position of not less than 12 inches from the ground, measuring from the bottom."). Furthermore,

the Court finds credible Deputy Perrenot's testimony that he ran the Camaro's license plates and learned the vehicle's insurance status was "unconfirmed" based on his statement upon approaching the car that it was a reason for the stop. *See* Dash Camera Video at 2:25–35. For these reasons, the Court finds Deputy Perrenot had reasonable suspicion to believe a traffic violation had occurred, and the initial stop was justified.

The next question is whether Deputy Perrenot's actions subsequent to the stop "were reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion developed during the stop." *Villafranco-Elizondo*, 897 F.3d at 640. The first minute of the encounter was limited to the passengers responding to Deputy Perrenot's request for a driver's license and proof of insurance. *See* Dash Camera Video at 2:25–3:35. Then Deputy Perrenot asked the passenger if she speaks English and how old she is. *Id.* at 3:35–50. Deputy Perrenot then asked the passenger if she had a passport. *Id.* at 3:53. Mejia-Estrada then provided Deputy Perrenot with an insurance card, which expired in 2019. *Id.* at 4:20–50. After reviewing some documents, Deputy Perrenot asked some itinerary questions and Mejia-Estrada told him about their trip from Houston to San Antonio and back. *Id.* at 5:23–7:15. Deputy Perrenot then returned to his police vehicle and made several calls to federal immigration officials to confirm the identities of Mejia-Estrada and the passenger. *Id.* at 7:22–24:10. Upon learning Mejia-Estrada or someone by the same name was previously convicted of manslaughter and deported, Deputy Perrenot contacted his superior officer to come up with a plan, then called another officer for back up, and stepped out of his police vehicle to talk to Mejia-Estrada about what he learned.

The first minute of the stop, where Deputy Perrenot asked for a driver's license and proof of insurance and was waiting to receive the documents, was reasonably related to the circumstances that justified the stop. That is, Deputy Perrenot was attempting to verify whether

the car was insured and, as with any traffic stop, whether Mejia-Estrada was a licensed driver. Deputy Perrenot's subsequent questions to the Camaro's passenger about whether she speaks English, her age, and whether she had a passport, were not related to traffic violations that justified the original stop. However, Deputy Perrenot testified that he was trying to ascertain whether the passenger could drive the Camaro, upon learning Mejia-Estrada only had a Honduran passport and could not legally drive. The Court finds this is a valid explanation for Deputy Perrenot's questions addressed to the passenger. Deputy Perrenot further explained that upon learning Mejia-Estrada and the passenger were from different countries, he began to suspect human trafficking and asked follow up questions about their itinerary. As both parties concede, Fifth Circuit authority clearly establishes that routine questions related to a traffic stop include the purpose and itinerary of the trip. *United States v. Villafranco-Elizondo*, 897 F.3d 635, 641 (5th Cir. 2018). Deputy Perrenot finally explained Mejia-Estrada's responses to his itinerary questions raised further suspicion about human trafficking or transportation of controlled substances. Namely, Mejia-Estrada's claim that they were traveling from Houston to San Antonio and back in one day—which is approximately 6 hours round trip—because they learned the friends they were visiting were unavailable, when Mejia-Estrada and the passenger both had cell phones, made no sense. Based on this, Deputy Perrenot decided to check Mejia-Estrada's identification with federal immigration officials. The Court finds he was reasonable in so doing.

  To summarize, the Court finds the Government has met its burden to show the traffic stop was constitutional under the standard set forth in *Terry*. The initial stop was justified by Deputy Perrenot's observation of two traffic violations. His subsequent questioning and investigation were justified by his reasonable suspicion, based on the presentation of two foreign identifications from different countries, no driver's license, no car insurance, and an unusual

travel itinerary, that Mejia-Estrada was engaged in illegal activity. The Court, therefore, denies the motion on Fourth Amendment grounds.

## II. Equal Protection

Mejia-Estrada argues that even if the Court finds Deputy Perrenot's actions were justified by reasonable suspicion, which it has, Deputy Perrenot violated the Fourteenth Amendment's Equal Protection Clause by targeting Mejia-Estrada because of his ethnicity. Mejia-Estrada concedes that neither the Supreme Court nor the Fifth Circuit has recognized a suppression remedy for violations of the Equal Protection Clause. *See United States v. Chavez*, 281 F.3d 479, 486–87 (5th Cir. 2002). Nevertheless, the Fifth Circuit recognizes discriminatory application of the law does not comport with the Fourteenth Amendment. *Id*. at 487. To establish a violation of the Equal Protection Clause, the defendant must offer proof of discriminatory purpose. *Id*.

In this case, Mejia-Estrada argues Deputy Perrenot pulled him over because he and his passenger were both Hispanic. Deputy Perrenot testified that when the Camaro drove past him, he could not see the occupants well enough to determine their ethnicity. Mejia-Estrada testified that he recalls looking Deputy Perrenot in the face when he drove past. Mejia-Estrada further provided evidence under seal for the Court's review of an incident involving Deputy Perrenot's prior employment which calls Deputy Perrenot's credibility into question. That being said, the Court need not make a credibility determination because the video evidence clearly shows Deputy Perrenot could not have seen the Camaro's passengers. *See* Dash Camera Video at 0:18. The Camaro drove past Deputy Perrenot's police vehicle in less than one second and the windows were either tinted or darkened such that the passengers cannot be seen. The Court, therefore, finds Deputy Perrenot could not have initiated the stop because of the Mejia-Estrada's ethnicity. The Court further finds, as articulated above, Deputy Perrenot's subsequent

questioning and investigation were justified by his reasonable suspicion, based on the presentation of two foreign identifications from different countries, no driver's license, no car insurance, and an unusual travel itinerary, that Mejia-Estrada was engaged in illegal activity. Mejia-Estrada offers no evidence showing Deputy Perrenot's actions were driven by a discriminatory purpose. Absent proof of discriminatory intent, Mejia-Estrada's Equal Protection argument fails.

## CONCLUSION

For the reasons discussed, the Court finds the Government has met its burden to show the traffic stop was constitutional and, therefore, **DENIES** the motion to suppress. See ECF No. 27.

It is so ORDERED.
SIGNED this 11th day of July, 2024.

_____
JASON PULLIAM
UNITED STATES DISTRICT JUDGE